**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ULLIMAN SCHUTTE** ) | |
| **CONSTRUCTION, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 02-1987 (RMC)** |
| ) | |
| **EMERSON PROCESS MANAGEMENT** ) | |
| **POWER & WATER SOLUTIONS f/k/a** ) | |
| **WESTINGHOUSE PROCESS** ) | |
| **CONTROL, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

Ulliman Schutte Construction LLC ("USC") sues Emerson Process Management

Power & Water Solutions, formerly known as Westinghouse Process Control Inc. ("WPC"), for

breach of contract, fraud, promissory estoppel, failure to negotiate in good faith, and attorneys' fees.

After full discovery, the parties filed cross motions for summary judgment. Based upon the parties'

motions, the oppositions and replies thereto, the arguments presented at a motions hearing held in

open court on March 23, 2006, and the entire record of this case, the Court finds that summary

judgment should be granted to WPC and denied to USC.

### I. BACKGROUND

USC is an Ohio-based contractor specializing in the construction of water and

wastewater treatment plants throughout the eastern United States.  Am. Compl. ("Compl.") ¶ 1.[1]

---

[1] These facts are taken from the First Amended Complaint [Dkt. #21] or from WPC's
Statement of Undisputed Material Facts ("Def.'s Facts") [Dkt. #35], the latter of which, unless noted,
is uncontested.  Because USC's Statement of Material Facts to Which There Is No Genuine Issue
[Dkt. #36] is largely contested, those facts will not be referenced.

WPC is a Pennsylvania-based corporation that, among other things, provides "process control" systems for water treatment plants. *See id.* ¶2.  When the District of Columbia Water and Sewer Authority ("DCWASA") sought to upgrade the Process Control and Computer System ("PCCS") at its Blue Plains Wastewater Treatment Plant, it invited WPC, along with two other bidders, to submit a proposal as prime contractor for the project (the "PCCS Project").  *Id.* ¶ 5.  The PCCS Project would require construction work of the sort performed by USC.  *Id.* ¶ 7.

### A. The Bid Exclusivity Agreement

WPC and USC agreed to work together to bid on the PCCS Project.  On June 19, 2001, they entered into a Bid Exclusivity Agreement ("BEA").  *Id.* ¶ 15; Def.'s Facts ¶ 1.  The BEA defined WPC as "Contractor" and USC as "Subcontractor," and it contemplated WPC's "preparation and submittal of a responsive and competitive bid proposal" to DCWASA for the PCCS Project.  Def.'s Facts  ¶ 1 & Exh. A (BEA).[2]  The parties' agreement to work exclusively with one another meant that USC had to decline offers from the other two bidders to work instead with them.  Compl. ¶ 9, 58.

Certain of the terms of the BEA are critical to this dispute and must be quoted in full to provide the necessary background for analysis.

> 1 . . . Contractor [WPC] further agrees that if it becomes the successful bidder and is awarded the Principal Contract by DCWASA utilizing Subcontractor's [USC] bid pricing, it will exclusively utilize Subcontractor to perform the Subcontractor Workscope specified by Contractor.

---

[2] USC objects to Paragraph 1 of WPC's Statement of Facts, suggesting that WPC's recitation of the BEA's purpose, "taken out of context," may give the Court the wrong "impression" of the parties' mutual objective.  This is not an objection of fact, but an argument as to the legal significance of the BEA.  USC does not maintain that the BEA is either incorrectly quoted or legally inoperative; to the contrary, it sues to enforce WPC's obligations under that contract.

2 . . . Subcontractor further agrees it will perform the Subcontractor Workscope of the Principal Contract, if awarded a subcontract by Contractor, based on the requirements of the Principal Contract between DCWASA and Contractor, Contractor's standard Subcontract Terms and Conditions which were transmitted as part of Contractor's 'Subcontractor Commercial Qualification Questionnaire', and modifications to these requirements and terms and conditions as negotiated and mutually agreed upon by Contractor and Subcontractor. . . .

. . . .

6.   Notwithstanding the obligations of both parties as stated above, Contractor and Subcontractor shall mutually be released from their obligations if the parties are unable to reach mutual agreement on any subsequent Subcontract terms and conditions, workscope or price negotiations pertaining to Subcontractor Workscope specified by Contractor, or in the event that Contractor is not the successful bidder.

7.   Neither party shall be responsible to the other for costs associated with proposal preparation or contract negotiation.

Def.'s Facts Exh. A.  Matthew Ulliman, USC's Vice President, signed the BEA on USC's behalf.

In his deposition, he testified:

Q.   And the bid exclusivity agreement, you read this before you signed the final, correct?

A.   Correct.

Q.   And you agreed — agreed to all of the terms of it, right?

A.   Correct.

Q.   And you understood the terms, right?

A.   Yes.

Def.'s Facts ¶ 3 & Exh. B (Ulliman Depo.) at 112-13.

In Paragraph 1 of the BEA, WPC agreed that, if it were awarded the principal contract by DCWASA ("Principal Contract"), it would exclusively use USC as a subcontractor for certain equipment and services.  Def.'s Facts ¶ 4.[3]  The equipment and services to be provided under any subcontract were to be agreed upon by USC and WPC as the "Subcontractor Workscope."  *Id.*  Mr. Ulliman testified that the BEA contemplated further negotiation between the parties on the scope of work to be performed by USC:

> Q. [The BEA] says that WPC and Ulliman Schutte are going to have to agree on the workscope, right?
>
> A. Correct.
>
> Q. It doesn't say that you have agreed on the workscope, correct?
>
> A. Correct.

Def.'s Facts ¶ 6 & Exh. B (Ulliman Depo.) at 122-23.

In Paragraph 2 of the BEA, USC agreed that it would perform the Subcontractor Workscope based on: (1) the requirements of the Principal Contract between DCWASA and WPC; (2) WPC's standard Subcontract Terms and Conditions ("Standard Terms"), which USC acknowledged receiving; and (3) any modifications to the requirements and terms of the Principal Contract or the Standard Terms "as negotiated and mutually agreed upon" by WPC and USC.  Def.'s Facts ¶ 5.  The payment terms, in particular, of both the Principal Contract and WPC's Standard Terms merit elaboration.  The Principal Contract provided for 50% payment on a milestone basis.

---

[3] USC objects to the statement in Paragraph 4 of WPC's Statement of Facts that "WPC agreed, ***subject to the terms of the BEA***, to exclusively use USC as a subcontractor" because the emphasized language is not contained in the BEA itself.  Pl.'s Opp'n to Def.'s Facts ¶ 2.  This is not an objection of fact but a legal argument regarding the proper interpretation of the BEA, which the Court will construe in light of its language and the record.

Compl. ¶¶ 11-12; *id.* ¶ 15.  Mr. Ulliman testified that he was aware of this payment provision before he signed the BEA.  Def.'s Facts ¶ 15.  He further acknowledged, by his signature on the BEA itself, that USC was "familiar with the requirements of the Principal Contract and agree[d] to be bound by the terms and conditions included therein with respect to the Subcontractor Workscope."  Def.'s Facts Exh. A (BEA) ¶ 2.  WPC's Standard Terms stated: "Unless otherwise provided in this Subcontract, the Contractor [WPC] shall make partial payments as the Work progresses . . . . Such application and payment shall be in accordance with the terms and conditions contained in the Principal Contract.  Contractor shall retain ten percent (10%) of each progress payment [pending inspection and tests]."  Def.'s Reply Mem. in support of its Mot. to Dismiss, Exh. A (WPC Standard Terms) ¶ 8.18.2.  Mr. Ulliman received a copy of WPC's Standard Terms on May 29, 2001, three weeks before executing the BEA.  *Id.*

Pursuant to Paragraph 6 of the BEA, if further negotiations failed to yield agreement on "any subsequent Subcontract terms and conditions, workscope or price negotiations," the parties would be released from their mutual promises of exclusivity.  Def.'s Facts ¶ 7 & Exh. A (BEA) ¶ 6.  Mr. Ulliman testified that, at the time he signed the BEA, he understood Paragraph 6 to mean that "in the unlikely event that there was some term that we could not reach agreement on, you know, we could just walk away from each other."  Def.'s Facts ¶ 10 & Exh. B (Ulliman Depo.) at 287.

**B. The Subcontracting Agreement Negotiations**

As contemplated by the BEA, USC provided information to WPC that was used by WPC in preliminary and final bids to DCWASA for the PCCS Project in 2001.  Def.'s Facts ¶ 13.  At some point in early 2002 — the precise date remains unclear — DCWASA awarded the Principal Contract to WPC.  *Id.*

In the meantime, USC and WPC had begun negotiating the terms of their potential subcontract. These efforts began just days after the BEA was signed, when on June 23, 2001, USC submitted its first subcontracting proposal to WPC. Compl. ¶ 17 & Exh. B. Regarding payment, that proposal provided: "Retainage shall be held at a rate of ten percent until the subcontract is fifty percent complete[,] at which time it shall [no] longer be withheld." Compl. Exh. B ¶ 19. In other words, USC sought a payment schedule by which it would be entitled to progress payments equivalent to 90% of the value of the work it had completed. Def.'s Facts ¶ 14. The DCWASA Principal Contract, by contrast, called for payments of 50% of the value of work completed toward specified milestones, with the remaining retained 50% paid upon completion of each particular milestone. *Id.* In a nutshell, USC wanted payment terms of "90/10," but the payment terms of the Principal Contract were "50/50."

The parties were unable to agree to USC's proposed modification to this payment term. The record reveals the following exchanges over the thirteen months that followed:

- On December 10, 2001, USC forwarded a revised proposal to WPC, which included the same payment terms as its June 23 initial proposal — namely, that "[r]etainage shall be held at a rate of ten percent until the subcontract is fifty percent complete at which time it shall no longer be withheld." Compl. Exh. C ¶ 20.

- On March 18, 2002, WPC forwarded a draft DCWASA Agreement to UPC that stated that "[p]ayment for claims . . . will be made provided that WPC receives adequate payment from DCWASA for those claims." Compl. Exh. D ¶ 23.

- On April 3, 2002, USC responded with a draft subcontract agreement that provided "[r]etainage of ten percent (10%) of the agreed upon scheduled value shall be withheld until this Subcontract is fifty percent (50%) complete at which time retainage will no longer be withheld." Compl. Exh. E ¶¶ 2.1.37, 8.18.2.

- On June 25, 2002, USC sent a new revision of the subcontract to WPC, which incorporated a new clause regarding the division of work between USC and

another subcontactor.  With respect to payment, the June 25 draft, like the April 3 draft, provided that "[r]etainage of ten percent (10%) of the agreed upon scheduled value shall be withheld until this Subcontract is fifty percent (50%) complete at which time retainage will no longer be withheld."  Compl. Exh. K ¶¶ 2.1.37, 8.18.2.

■ On June 28, 2002, WPC forwarded a "Clean Draft" of the proposed subcontract to USC, which provided that "payment shall be in accordance with the terms and conditions contained in the Principal Contract.  All amounts invoiced by the Subcontractor shall be subject to retain[a]ge in accordance with the Principal Contract, however, Contractor shall not withhold any additional amounts as retainage."  Compl. Exh. L ¶ 8.18.2.  The language previously proposed by USC, which provided for 10% retainage until the subcontract was 50% complete, was not a part of the June 28 Clean Draft.  *See id.* ¶ 2.1.

■ On July 2, 2002, USC wrote to WPC commenting on the Clean Draft and insisting on its preferred 90/10 payment structure.  Compl. Exh. M ¶ 10.

■ On July 16, 2002, WPC mailed a final version of a subcontract to USC.  This final version contained the same payment provision as the June 28 Clean Draft (i.e., 50/50, by reference to the Principal Contract).  Compl. Exh. N.

The July 16, 2002, version of the subcontract agreement was WPC's final offer to USC.  Def.'s Facts ¶ 21.  Although it was received by USC on Wednesday, July 17, 2002, USC's President, Mr. Schutte, was then out of town, and did not review it until Monday, July 22, 2002.  Compl. ¶ 40. That morning, USC called WPC to advise that it had just seen the letter and proposed subcontract, and to request some time to review and respond.  *See* Compl. Exh. O.  WPC responded that it had "other options" and had "decided to go in a different direction."  Compl. ¶ 41.

USC faxed a letter to WPC prior to noon on July 22, 2002, advising of USC's willingness to sign a subcontract as long as WPC issued a contract containing the "agreed upon" USC payment provision.  *Id.* ¶ 46 & Exh. P ("We must have a clause that provides 90% payment, 10% retainage.").  WPC refused to negotiate further or to reconsider its decision not to work with USC. Compl. ¶¶ 47-49, 52.  When DCWASA contacted WPC on USC's behalf, DCWASA was told

that there was "more to it than the payment terms" and that WPC had decided "to go a different direction." Compl. ¶ 53.  USC, in turn, decided to go to court.

In its Amended Complaint, USC alleges that: (1) WPC breached the BEA when it failed to subcontract work on the PCCS Project to USC; (2) WPC falsely represented that it would issue a subcontract in order to induce USC to provide only WPC with quotations for the PCCS Project; (3) USC justifiably and reasonably relied on WPC's promise to issue the subcontract to USC; (4) WPC failed in its obligation to negotiate in good faith; and (5) USC should recover its damages and attorneys' fees because WPC acted in bad faith and has been stubbornly litigious.

## II.  LEGAL STANDARDS

The parties have filed cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, and affidavits filed pursuant to discovery show that, first, 'there is no genuine issue as to any material fact' and, second, 'the moving party is entitled to a judgment as a matter of law.' "  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting Fed. R. Civ. P. 56(c)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this determination, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor; it is not permitted to make credibility determinations or weigh the evidence.  *Holcomb*, 433 F.3d 895 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000)).

Summary judgment is not a "disfavored procedural shortcut" but, rather, an aid to the "just, speedy, and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  "The mere existence of *some* alleged factual dispute between the parties will not

defeat summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Holcomb*, 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Id.*  "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "If there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 322).

### III. JURISDICTION AND VENUE

USC is an Ohio limited liability company with its principal place of business in Miamisburg, Ohio.  Compl. ¶ 1.  Although the Supreme Court has never squarely addressed the citizenship of limited liability companies, it has recognized that the "Courts of Appeals have held the citizenship of each member of an LLC counts for diversity purposes." *Grupo Dataflux v. Atlas Global Group*, 541 U.S. 567, 586 n.1 (2004) (citing *GMAC Comm. Credit LLC v. Dillard Dep't Stores*, 357 F.3d 827, 829 (8th Cir. 2004); *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998)); *accord Johnson v. Columbia Props. Anchorage LP*, 437 F.3d 894, 899 (9th Cir. 2005) (joining "every circuit that has addressed the question" to hold that, "like a partnership, an LLC is a citizen of every state of which its owners/members are citizens").  Although the Complaint is silent as to the identities and citizenship of USC's members, USC's counsel represented to the Court, in a motions hearing on March 23, 2006, that USC has just two members, Matthew Ulliman and Herbert Schutte, both of whom are citizens of Ohio.  Thus, USC is a citizen of Ohio for diversity

purposes.

WPC is a Delaware corporation with headquarters in Pittsburgh, Pennsylvania. Answer ¶ 2. For diversity jurisdiction purposes, "a corporation is 'deemed to be a citizen' only of 'any State by which it has been incorporated' and 'of the State where it has its principal place of business.' " *Wachovia Bank, N.A. v. Schmidt*, 126 S. Ct. 941, 951 (2006) (quoting 28 U.S.C. § 1332(c)(1)). Thus, for diversity purposes, WPC is a citizen of both Delaware and Pennsylvania. *See id.* (noting that "corporations ordinarily rank as citizens of at most 2 States").

By reason of the complete diversity of the parties, and the amount in controversy (exclusive of interest and costs) exceeding $75,000.00, Compl. ¶ 52, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

USC asserts that venue is proper pursuant to 28 U.S.C. § 1391(a), Compl. ¶ 4, and WPC does not object, Answer ¶¶ 4, 80-92. *See Chatman-Bey v. Thornburgh*, 864 F.2d 804, 813 (D.C. Cir. 1988) ("[A] defense of improper venue . . . is waived unless the defense is asserted by a pre-answer motion (*i.e.*, Rule 12(b)) or in a responsive pleading, *i.e.*, the answer or a timely amendment thereto.") (citing Fed. R. Civ. P. 12(h)(1) and C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 1388 (1969)).

## IV. CHOICE OF LAW

New rules for deciding conflicts of law might be necessary when contracts are negotiated, executed, and performed entirely in cyberspace. This case comes close to that circumstance, but there is just enough touch with the real world to apply traditional concepts. Throughout most of their relationship, the parties remained in their respective places of business and communicated by email, facsimile, and telephone. USC argues that District of Columbia law should

apply because the parties worked together to bid on a project that would be constructed in the District. Pl.'s Opp'n to Def.'s Mot. at 2-4.  WPC argues that Pennsylvania law should apply because most of the parties' subcontracting negotiations pursuant to the BEA occurred in Pennsylvania; thus, it submits, the BEA could only have been breached, if at all, in that state.  Def.'s Mot. at 3-5.

Federal courts sitting in diversity must apply the choice-of-law rules of the forum state.  *Klaxon Co. v. Sentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *YWCA v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002).[4]  In contract actions, the District of Columbia has adopted the approach of the Restatement (Second) of Conflict of Laws § 188.  *Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997) (citing *Fin. Am. Corp. v. Moyler*, 494 A.2d 926, 929 & n.7 (D.C. 1985)).  "Where, as here, the parties to a contract have not specified which law governs their agreement, the Restatement approach requires the court to weigh [the] various jurisdictions' contacts with the transaction at issue and to determine which has the most substantial interest in the matter."  *Id.*  According to the Restatement, five factors are relevant to this analysis: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties."  Restatement (Second) of Conflict of Laws § 188.

Taking the last factor first, WPC is incorporated in Delaware but has its principal place of business in Pennsylvania.  USC has its principal place of business in Ohio.  The parties met

_____

[4] The Court recognizes that it ordinarily must determine whether there is a true conflict between the laws of the relevant jurisdictions.  *See YWCA*, 275 F.3d at 1150.  Here, the parties' briefs are especially unhelpful in this analysis, and the Court will assume, without deciding, that such a conflict exists.

once in Ohio, when they first discussed working together on the bid for the PCCS Project, but that was before negotiation of the BEA began.  Compl. ¶ 10.  All contacts between USC and WPC regarding the BEA occurred via email, facsimile, or telephone between their respective offices.  Def.'s Mot. at 4.  The BEA was signed via facsimile between the parties' offices.  *Id.*; Compl. Exh. A.  After the BEA was signed, the parties had various face-to-face meetings at WPC's office in Pittsburgh to negotiate the subcontracting agreement, although discussions were mainly conducted via email, facsimile, and telephone.  *See* Def.'s Mot. at 4.  The District of Columbia was, of course, the situs of the PCCS Project.

In view of these facts, WPC argues that Pennsylvania has the most substantial interest "because the alleged breach could have only occurred in Pennsylvania, the majority of the meetings occurred in Pennsylvania, and all other contacts occurred equally between Pennsylvania and Ohio."  Def.'s Mem at 4.  USC argues that the District of Columbia has a "natural interest" in the matter because the "[a]greement at issue deals with a specific physical thing, the PCCS Project," which is located in the District.  Pl.'s Opp. at 4.  Further, it suggests that it is "logically assumed" that the parties would have expected D.C. law to apply "as both the risk and the performance contemplated by the [BEA] and draft subcontracts were within the District."  *Id.*

The contract at issue in the First Amended Complaint is the BEA, which affected only the relationship between WPC and USC and has only a tangential relationship to the District of Columbia.  USC misunderstands this basic point when it argues that the BEA dealt with a physical thing located in D.C.  To the contrary, the BEA was a contract between two foreign corporations about how they would work together to attempt to obtain work in the District; it was not a contract about how that work, if obtained, would be divided or performed — these issues were to be

addressed in a separate subcontracting agreement. *Cf. Northrop Corp. v. AIL Sys., Inc.*, 959 F.2d 1424 (7th Cir. 1992) (observing that "subcontracts which govern actual work being performed" implicate different interests than "agreements entered into in the hope that they will lead to" such work). The performance contemplated by the BEA was to be concluded by (1) the submission of necessary proposals and information to DCWASA and (2) the negotiation of the subcontract(s) between WPC and USC for the actual work. Had DCWASA awarded the PCCS Project work to one of WPC's competitors, the BEA and any negotiated subcontracts would have died aborning, without ever getting near the District of Columbia. None of these facts touches upon D.C. at all. The Court therefore concludes that the District of Columbia has no particular interest in how the BEA is interpreted or enforced.

If any State has an interest here, it must be Pennsylvania. Both Ohio, as USC's center of operations, and Pennsylvania, as WPC's principal place of business, have some interest in the BEA because it affects their corporate residents, who were in those States at the time of the emails, telephone calls, and facsimiles leading to the BEA's execution. However, with the exception of a single, early meeting in Ohio, all face-to-face meetings between the parties occurred in Pennsylvania as they carried out the purposes of the BEA. If WPC breached the BEA as alleged, it did so in Pennsylvania when it prepared and mailed its final subcontract offer and then indicated its unwillingness to negotiate further. Thus, Pennsylvania, as the place of performance of the BEA and the place of its alleged breach, is the jurisdiction with the most "contacts with the transaction at issue" and it has the "most substantial interest" in the matter. *See* Restatement (Second) of Conflict of Laws § 188; *Ideal Elec.*, 129 F.3d 143, 148 (D.C. Cir. 1997). Thus, the Court will apply

Pennsylvania law to USC's contract claims.[5]

A slightly different analysis is required for USC's fraud claim, which sounds in tort. *See Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004) (noting that, under D.C. choice of law rules, "different law may apply to different issues in a lawsuit"). In tort cases, the District of Columbia follows the Restatement (Second) of Conflict of Laws § 145, which calls for the application of "the law of the jurisdiction with the more 'substantial interest' in the resolution of the issue." *Id.* (citing *Lamphier v. Wash. Hosp. Ctr.*, 524 A.2d 729, 731 (D.C. 1987)). Though this "substantial interest" test is largely similar to that applied in contract cases, the relevant factors differ somewhat. Under § 145 of the Restatement, the Court should consider "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship is centered." Restatement (Second) of Conflict of Laws § 145. Here, WPC's alleged misrepresentations were made in Pennsylvania, and the parties' post-BEA negotiations, to the extent that they took place in person rather than electronically, occurred in Pennsylvania rather than Ohio. Thus, applying the factors in § 145 of the Restatement, the Court comes to the same conclusion: Pennsylvania has the more substantial interest in the resolution of USC's tort claims.

## V. DISCUSSION

The First Amended Complaint alleges five counts: (I) breach of contract; (II) fraud; (III) promissory estoppel; (IV) failure to negotiate in good faith; and (V) attorneys' fees. Each is

---

[5] During the motions hearing on March 23, 2006, after the Court expressed its inclination to apply Pennsylvania law, counsel for USC requested, and was granted, leave to file a 5-page supplementary memorandum to argue for the application of Ohio law. Counsel took this opportunity to file a rambling 23-page memorandum reiterating, foremost, its arguments for the application of D.C. law. This memorandum does not comply with the Court's Order or change its analysis.

addressed in turn.

**A.  Count I: Breach of Contract**

Count I of the Complaint alleges that WPC materially breached the BEA when it failed to subcontract with USC for the PCCS Project.  Compl. ¶ 51.  USC's brief focuses this argument on WPC's failure to adhere, during the subcontracting agreement negotiations, on an oral agreement — predating and not reflected in the BEA — to pay USC on 90/10 terms, rather than on the 50/50 terms of the Principal Contract.

A breach of contract claim under Pennsylvania law has three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Williams v. Nationwide Mut. Ins. Co.*, 750 A.2d 881, 884 (Pa. Super. Ct. 2000).  In reading the terms of a contract, it is often said that "[c]onstruction . . . is different than interpretation and is purely a question of law" rather than a question of fact.  *See, e.g.*, *Williams v. Metzler*, 132 F.3d 937, 946 (3d Cir. 1997).  Pennsylvania courts, however, place less weight on this distinction.  Under Pennsylvania law, even "[t]he task of interpreting a contract is generally performed by a court rather than by a jury." *Std. Venetian Blind Co. v. American Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983) (citing, *inter alia*, *Gonzalez v. U.S. Steel Corp.*, 398 A.2d 1378 (Pa. 1979)).[6]

---

[6] *Gonzalez* explains that "[f]or a variety of reasons the common law has long thought it best to leave to the court rather than to the jury the essentially factual question of what the contracting parties intended." *Gonzalez*, 398 A.2d at 1385.  A jury question arises, by contrast, only where "it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." *Id.*

### 1. Plain Meaning

In *Steuart v. McChesney*, 444 A.2d 659 (Pa. 1982), the Pennsylvania Supreme Court reaffirmed its adherence to the "plain meaning rule of construction." It stated:

> It is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement. . . . When a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence. Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended.

*Id.* at 661 (citations and internal quotation marks omitted). Applying this rule to this case, the Court concludes that the plain language of the BEA unambiguously provides for 50/50 payment terms, by reference to the Principal Contract, unless the parties mutually agreed otherwise.

In Paragraph 2 of the BEA, USC agreed that it would perform the Subcontractor Workscope based on: (1) the requirements of the Principal Contract between DCWASA and WPC; (2) WPC's Standard Terms; and (3) any modifications to the requirements and terms of the Principal Contract or the Standard Terms "as negotiated and mutually agreed upon" by WPC and USC. Def.'s Facts ¶ 5 & Exh. A (BEA) ¶ 2. With respect to payment, the Principal Contract provided, as Mr. Ulliman was well aware, for 50% payment on a milestone basis. *Id.* ¶ 15. WPC's Standard Terms, of which Mr. Ulliman was likewise aware, were consistent with this payment structure, and provided that "payment shall be in accordance with the terms and conditions contained in the Principal

Contract."[7]   And it is undisputed that, despite numerous negotiations, exchanges of drafts, and meetings related to the subcontract, the parties were unable to "mutually agree[] upon" any modification to this payment term.  Def.'s Facts ¶ 22.  In view of the plain language of Paragraph 2 of the BEA, the Court concludes that WPC was within its rights to insist on the 50/50 payment term provided in the Principal Contract.  And, because the parties were unable to agree otherwise, pursuant to Paragraph 6 of the BEA, WPC was released from its promise of exclusivity.  Def.'s Facts Exh. A (BEA) ¶ 6 (providing that the parties "shall mutually be released from their obligations if . . . unable to reach mutual agreement on any subsequent Subcontract terms and conditions, workscope or price negotiations").  Indeed, Mr. Ulliman was aware of this possibility from the outset.  He testified that he recognized there was some risk that the parties would not execute a subcontract, and that Paragraph 6 meant that if "there was some term that we could not reach agreement on, you know, we could just walk away from each other."  Def.'s Facts ¶ 10 & Exh. B (Ulliman Depo.) at 287.  Based on the plain meaning of the BEA's text, the Court concludes that USC has failed to establish the breach of a duty imposed by the BEA.

### 2. Parol Evidence

To avoid this conclusion, USC argues that, despite the contrary provisions of the Principal Contract, WPC agreed to pay it at 90/10 terms — a claim that WPC hotly disputes.  *See,*

---

[7] The further provision in WPC's Standard Terms that "Contractor shall retain ten percent (10%) of each progress payment [pending inspection and tests]" is not to the contrary.  The Court construes this phrase to entitle WPC to retain from USC an additional 10%, above and beyond the 50% that would be retained from WPC by DCWASA pursuant to the Principal Contract.  This reading is supported by the June 28, 2002, Clean Draft of the subcontracting agreement, in which WPC offered to eliminate this additional retainage.  *See* Compl. Exh. L ¶ 8.18.2 ("All amounts invoiced by the Subcontractor shall be subject to retain[a]ge in accordance with the Principal Contract, however, Contractor shall not withhold any additional amounts as retainage.").

*e.g.*, Compl. ¶ 12; Pl.'s Mot. at 5-7.  It is undisputed, however, that this purported agreement was an *oral* one reached *before* the BEA was signed.  Def.'s Facts ¶ 19; *see also* Def.'s Facts Exh. B (Ulliman Depo.) at 144 ("[I]t was before we signed the exclusivity agreement.  How much before? I don't exactly recall.").  There is no written record of this oral agreement, "but the concept was agreed to verbally."  Def.'s Facts ¶ 20 & Exh. B (Ulliman Depo.) at 169.

As evidence of this oral agreement, USC emphasizes that the "commercial terms" used in the parties' subsequent contracting agreement negotiations were at all times "consistent" with such an understanding.  *See, e.g.*, Pl.'s Mot. at 18-20; Pl.'s Opp'n at 5.  Accordingly, WPC's final offer, insisting on 50/50 payment terms, was "inconsistent with major and previously used commercial terms and USC's quote for the work on the [PCCS] Project."  Pl.'s Opp'n at 5.[8]  The record, however, tells a different story.  While USC's post-BEA offers to WPC were consistent with its desire for 90/10 terms, *see* Compl. Exhs. C, E, K, M, WPC's counteroffers evidenced its desire to stick to the 50/50 terms of the Principal Contract, *see id.* Exhs. D, L, N.  Thus, the parties' "mutual agreement" to these payment terms that USC insists is "obvious" is simply not apparent to the Court.  *See* Pl.'s Mot. at 1.  Rather, USC's bid and later subcontract drafts were premised on its favored 90/10 terms, to which it thought it had obtained WPC's oral assent.  But after the alleged oral agreement, Mr. Ulliman signed the BEA, which bound USC to the 50/50 terms of the Principal Contract, unless the parties negotiated otherwise.

Because the parties' post-BEA subcontract negotiations provide no support for the contention that, despite the BEA's text, WPC had orally agreed to pay USC on 90/10 terms, USC's

---

[8] USC briefly mentions that it was also a breach of contract for WPC to mail the final subcontract proposal to USC when all prior communications were sent by email.  Pl.'s Opp'n at 5. There is no factual or legal support for this allegation, and it is not further argued by USC.

claim turns on whether parol evidence is admissible to vary the BEA's terms.   The Pennsylvania

Supreme Court recently recapitulated the parol evidence rule as follows:

> Where the parties, without any fraud or mistake, have deliberately put
> their engagements in writing, the law declares the writing to be not
> only the best, but the only, evidence of their agreement. All
> preliminary negotiations, conversations and verbal agreements are
> merged in and superseded by the subsequent written contract . . . and
> unless fraud, accident or mistake be averred, the writing constitutes
> the agreement between the parties, and its terms and agreements
> cannot be added to nor subtracted from by parol evidence.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (quoting *Gianni v. Russell*

*& Co.*, 126 A. 791, 792 (Pa. 1924)) (omission in original).   For the parol evidence rule to apply,

> there must be a writing that represents the entire contract between the
> parties.   To determine whether or not a writing is the parties' entire
> contract, the writing must be looked at and if it appears to be a
> contract complete within itself, couched in such terms as import a
> complete legal obligation without any uncertainty as to the object or
> extent of the [parties'] engagement,  it is conclusively presumed that
> [the writing represents] the whole engagement of the parties . . . .

*Id.* (alterations in original).  If a writing constitutes the parties' "entire contract," the parol evidence

rule applies, and "evidence of any previous oral or written negotiations or agreements involving the

same subject matter as the contract is almost always inadmissible to explain or vary the terms of the

contract." *Id.* at 436-37.  The determination of whether the BEA is the final and complete expression

of the parties' agreement is, again, "a matter of law to be decided by the court rather than a jury."

*Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 995 (3d Cir. 1987).

USC's argument that the BEA is only partially integrated, and thus is susceptible to

parol evidence, appears at first blush to have some force.  It is, after all, undisputed that the BEA

expressly contemplated further negotiation on certain topics — most critically, the scope of work

to be subcontracted to USC, Def.'s Facts ¶ 4 — thus, the argument goes, the BEA could not have constituted the parties' entire agreement. *See, e.g.*, Pl.'s Opp'n at 6, 8. However, this argument conflates the parties' intent in entering the BEA with their intent in drafting a subcontract; these documents have related but distinct purposes. In signing the BEA, the parties did not intend to enumerate the workscope details — those details were left for later negotiations and would be memorialized in the eventual subcontract. Their purpose in securing the BEA was more limited: They sought to set forth conditions under which they would work together to bid on the PCCS Project, and — as evidenced by the title of the document itself — under which their mutual promises of exclusivity would remain binding.

The parties agreed to work together exclusively to bid on the PCCS Project, which they did. They also agreed to negotiate the scope of work, which they did.[9] Both sophisticated parties, they understood that there was some risk that they would be unable to agree on a subcontract, and provided for release of their obligations under such circumstances. When WPC made its final subcontract offer, with a 50/50 payment term consistent with the Principal Contract, USC reiterated its willingness to sign — but on its own preferred payment terms. At that point, the release provisions of the BEA kicked in, exactly as the parties had agreed. On these facts, the Court is convinced that the BEA "represent[s] the parties' entire agreement" regarding the conditions under which their mutual promises of exclusivity would remain binding. *See Yocca*, 854 A.2d at 436. Thus, the parol evidence proffered by USC is inadmissible to vary the BEA's terms.

---

[9] The scope of work itself was not a sticking point. As of July 22, 2002, when USC wrote to WPC concerning the proffered subcontract, USC indicated that the only outstanding issues were its requirement of (1) two subcontracts, and (2) a clause providing for 90% payment, 10% retainage. Compl. Exh. P.

-20-

Even if the BEA were only partially integrated, however, the parol evidence would still be inadmissible because it contradicts a subject specifically covered by the BEA. Several cases have applied the doctrine of partial integration to temper application of the parol evidence rule in Pennsylvania. *See, e.g.*, *Paxson v. Asensio*, No. 02-8986, 2003 U.S. Dist. LEXIS 7719, at *14 n.7 (E.D. Pa. 2003) (recognizing that "where the writing is intended to be final but incomplete . . . [the] writing may not be contradicted by evidence of prior agreements or expressions, [but] . . . may be supplemented by evidence of consistent additional terms"); *Cohen v. Wolgin*, No. 87-2007, 1995 U.S. Dist. LEXIS 972, at *17 n.6 (E.D. Pa. 1995) (noting that, to the extent an agreement is partially integrated, "evidence of negotiations leading to [its] formation is inadmissible to show an intent at variance with the language of the written agreement"); *Bessen Bros., Inc. v. Brooks*, 107 A.2d 623, 626 (Pa. Super. Ct. 1954) ("Even if there would be only partial integration . . . the rule against disputing the terms of the document would be applicable to so much of the transaction as is embodied in the document, but not to the remainder."); *Kisinger v. Pa. Trust Co.*, 180 A. 79, 82 (Pa. Super. Ct. 1935) ("[I]n cases of partial integration . . . the rule against disputing the terms of the document will be applicable to *so much of the transaction as is so embodied, but not to the remainder*."). Here, the parties conditioned their mutual promises of exclusivity on USC's performance of the Subcontractor Workscope based on the requirements of the Principal Contract and WPC's Standard Terms, unless otherwise agreed. The Principal Contract and WPC's Standard Terms required 50/50 payment terms. The BEA was integrated as to this payment term; USC's parol evidence to the contrary in inconsistent with this understanding, and is thus inadmissible. *See*

*Cohen*, 1995 U.S. Dist. LEXIS 972, at *17 n.6; *Kisinger*, 180 A. at 82.[10]

In sum, WPC did not breach the BEA by standing on its very terms. As the Pennsylvania Superior Court put it in a similar case:

> Under these circumstances what [USC] seek[s] to do is exactly what the Pennsylvania parol evidence rule forbids: to admit evidence of a prior representation in a fully integrated written agreement. If [USC] intended to rely on what they now contend was a centrally important representation conveyed by [WPC] in the course of the negotiations over a multi-million dollar commercial . . . transaction, then [USC] should have insisted that the representation be set forth in their integrated written agreement.

*1726 Cherry St. P'ship v. Bell Atl. Props., Inc.*, 653 A.2d 663, 670 (Pa. Super. Ct. 1996).  Having explicitly and knowingly agreed to different payment terms, USC cannot now rely on parol evidence to change its agreement.  "If [USC] relied on any understanding, promises, representations or agreements made prior to the execution of the written  contract . . . , they should have protected themselves by incorporating in the written agreement the promises or representations upon which they now rely, and they should have omitted the provisions which they now desire to repudiate and nullify."  *McGuire v. Schneider, Inc.*, 534 A.2d 115, 119-20 (Pa. Super. Ct. 1987).  Pursuant to Paragraph 6 of the BEA, the failure of the parties to reach a different agreement on terms released

---

[10] *Giotis v. Lampkin*, 145 A.2d 779 (D.C. Mun. App. 1958), on which USC relies, is not to the contrary.  *Giotis* recognized that, "where the parties have not *intended* that the written document cover all of their subjects of negotiation but only certain of them," parol evidence may be admitted under the doctrine of partial integration.  *Id.* at 781.  Under that circumstance, "[t]he true test to be followed in deciding whether the [parol] evidence shall finally be admitted is whether the parties *intended* that the writing embrace their agreement on the *subject* in question."  *Id.* at 781 (second emphasis added).  The Court perceives no material difference between this standard and the rules applied in *Cohen* and *Kisinger*, and were *Giotis* good law in Pennsylvania, it would not permit evidence of the pre-BEA alleged oral agreement on payment terms.  Mr. Ulliman understood and agreed to the BEA, even though it bound USC to the payment terms of the Principal Contract unless the parties negotiated otherwise.  Thus, the BEA "embraced" the parties' agreement on the subject, and parol evidence or a prior oral agreement would remain inadmissible.  *See id.*

both from their pledges of exclusivity.  WPC acted in conformity with the BEA when it declined modified payment terms for USC.

### 3. The Bonding Issue

USC also submits that it is an "undisputed fact that WPC agreed to have the [PCCS Project] proceed under two separate contracts, one bonded for the vast majority of the work [Phase I] and one unbonded for the very limited remaining work [Phases II and III]."  Pl.'s Opp'n to Def.'s Mot. at 1-2; *see also* Pl.'s Mot. at 7-8.  It argues that WPC's failure to offer USC separate subcontracts for Phase I (bonded) and Phases II–III (unbonded) constitutes an independent breach of the parties' agreement.  Because USC agrees that the terms of the BEA itself do not mandate either a single or separate contracts, Pl.'s Mot. at 8, this argument turns on the existence of an oral agreement that there be distinct contracts for bonded and unbonded work.

Under Pennsylvania law, an oral contract, like a written one, is established by proving (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.  *See Pennsy Supply, Inc. v. Am. Ash Recycling Corp.*, No. 945-MDA-2005, 2006 Pa. Super. LEXIS 243, at *6 (Pa. Super. Ct. 2006).  "Allegations in support of an oral contract must be clear and specific."  *Morris v. Smith*, 584 A.2d 331, 333 (Pa. Super. Ct. 1990); *see also Sarlo v. Webster*, No. 02-6708, 2003 U.S. Dist. LEXIS 13272, at *4 (E.D. Pa. 2003) ("Where the alleged agreement is not evidenced by a writing, plaintiff bears the burden of establishing the existence and terms of an oral contract by clear and precise evidence.").

USC points the Court to instances in which it clearly requested separate subcontracts.  *See, e.g.*, Pl.'s Mot. Exh. 3 (cover letter to preliminary BEA draft) (advising that USC's surety "require[s] that our Subcontract be limited to the Phase I work only").  And it points to evidence that

WPC was, at least at one point, amenable to such an arrangement.  *See* Pl.'s Mot. Exh. 5 (WASA

Agreement) at 4 ¶ 21 (providing in an unexecuted draft that bonds "shall be provided by and at the

expense of USC for Phase 1 and [another subcontractor] for Phases 2 and 3").  There is also evidence

that Mr. Ulliman of USC communicated this fact to Tom Markovich of WPC via telephone.  Pl.'s

Mot. Exh. 1 at 85.  And there is even evidence that Mr. Markovich *understood* that USC could not

bond the entire duration of the project.  Def.'s Opp'n to Pl.'s Mot. Exh. 2 (Markovich Depo.) at 39-

40.  However, the Court is unable to find any evidence that WPC ever *agreed* to more than one

subcontract; that is, it cannot find "clear and precise" evidence from which a jury could infer a

meeting of the minds or the requisite intent to be bound by such a promise.  *See Sarlo*, No. 2003 U.S.

Dist. LEXIS 13272, at *4; *see also Snaith v. Snaith*, 422 A.2d 1379, 1382 (Pa. Super. Ct. 1980).

Even Mr. Ulliman's testimony is at best equivocal on this point: When asked what Mr. Markovich

said in response to his concerns about bonding, he testified, "I don't recall.  I recall that I told him

what we could do and he said that was acceptable to him."  Pl.'s Mot. Exh. 1 (Ulliman Depo.) at 85.

The Court "cannot give legal significance to vague promises or to statements that reflect only the

aspirations or hopes of [a contracting party], whether written or spoken."  *Clay v. Advanced*

*Computer Applications, Inc.*, 536 A.2d 1375, 1383 (Pa. Super. Ct. 1988).

       In any event, USC's argument on the bonding issue founders on two other facts.

First, WPC's July 16, 2002, "final offer" is prefaced by a cover letter offering that "WPC would be

willing to enter into a separate contract for the phase 2 and 3 work at some time prior to the

completion of the phase 1 aspect of the scope."  Compl. Exh. N at 1.  Thus, even if there were an

agreement on this point, USC cannot demonstrate that it was breached.  Second, the record makes

plain that the parties' relationship would have fallen apart based on their dispute over payment terms

-24-

alone.  In other words, even had WPC offered USC separate Phase I and Phases II–III subcontracts, it would not have agreed to modify the payment terms for Phase I work as USC insisted.  *See, e.g.*, Compl. ¶ 46 & Exh. P ("We must have a clause that provides 90% payment, 10% retainage.").  Thus, even if WPC breached an agreement on the bonding issue, that breach caused no damage to USC.

For these reasons, the Court will grant summary judgment to WPC on Count I.

### B.  Count II: Fraud

USC seeks to avoid the impact of dismissal of its contract claim by alleging the tort of fraud by WPC.  Count II alleges that WPC falsely represented that it would "issue a subcontract . . . to USC" and "exclusively utilize [USC] to perform the subcontractor workscope."  Compl. ¶¶ 54, 56.  WPC allegedly made this representation "to induce USC to provide only WPC with quotations for the PCCS Project and to prevent USC from working with" other bidders.  *Id.* ¶ 58. USC further alleges that "WPC either never intended to award the subcontract to USC or deliberately concealed its intention to rely upon different bonding and payment provisions to prevent an award of the subcontract to USC."  *Id.* ¶ 59.

Under Pennsylvania law, the elements of fraud are: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."  *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994); *Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005).  The plaintiff must plead fraud with particularity, *Youndt*, 868 A.2d at 544, and has the burden of proving the same by clear and convincing evidence, *Office of Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 54 n.7 (Pa. 2005).

WPC contends that USC's fraud allegations are an impermissible attempt to convert a contract claim into a tort claim by simply averring that WPC never intended to meet its contractual obligations.  Pl.'s Opp'n at 18-19.  The Court perceives this as an argument for application of Pennsylvania's "gist of the action doctrine," which finds its clearest expression in *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10 (Pa. Super. Ct. 2002).  *See also Williams v. Hilton Group PLC*, 93 Fed. Appx. 384 (3d Cir. 2004) (unpublished) (predicting that the Pennsylvania Supreme Court would adopt the doctrine as set out in the Superior Court's cases).  The doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from recasting ordinary breach of contract claims into tort claims."  *eToll*, 811 A.2d at 14.  As *eToll* explains the distinction, "tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals."  *Id.*  Because the allegations of fraud in *eToll* "were created and grounded in the parties' contract" and were "compensable in an ordinary contract action," the court found that the fraud was "not so tangential to the parties' relationship so as to make fraud the gist of the action."  *Id.* at 20-21.  Concluding that the fraud claim was "inexplicably intertwined" with the contract claims, the court affirmed its dismissal.  *Id.* at 21.

In *Williams*, the Third Circuit applied the "gist of the action" doctrine to bar a claim for fraud in the inducement similar to the one at bar.  *Williams*, 93 Fed. Appx. at 385.  The plaintiff in *Williams* brought a fraud-in-the-inducement claim based on the defendant's lying about his intentions to honor a letter of intent.  *Id.* at 386.  Concluding that this tort claim was founded solely on the defendant's agreement to grant the plaintiff certain exclusive purchase rights, the court found that the gist of the claim sounded in contract, not tort.  *Id.* at 387.  In so holding, the *Williams* court

-26-

relied on *Penn City Investments, Inc. v. Soltech, Inc.*, No. 01-5542, 2003 U.S. Dist. LEXIS 22321 (E.D. Pa. 2003), in which the district court, confronted with allegations that pre-contract statements induced the plaintiff to enter into a contractual relationship, held that the plaintiff's fraudulent inducement claim was barred because the "pre-contractual statements concerned specific duties that the parties later outlined in the contract." *Id.* at *12.  This case is indistinguishable from *Williams* and *Penn City*.[11]  USC's rights were created and grounded in the BEA and, in the words of the *eToll* court, are "not so tangential to the parties' relationship so as to make fraud the gist of the action." *eToll*, 811 A.2d at 20-21.  Thus, USC's fraud claim is barred under the gist of the action doctrine.

Further, to the extent that USC's fraudulent misrepresentation argument requires proof of the parties' purported oral agreement to 90/10 rather than 50/50 terms, it also fails by operation of the parol evidence rule.  Under Pennsylvania law, "while parol evidence may be introduced based on a party's claim that there was a fraud in the execution of the contract, i.e., that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, i.e., that an opposing party made false representations that induced the complaining party to agree to the contract." *Yocca*, 854 A.2d at 437 n.26; see also *1726 Cherry St. P'ship*, 653 A.2d at 670 (synthesizing cases and holding that, in

---

[11] Dissenting in *Williams*, Judge Becker protested the panel majority's "crabbed" application of the gist of the action doctrine, arguing that, on these facts, the operative principle should be that where there is "a subjective and undisclosed intent not to perform, a fraud claim is stated." *Williams*, 93 Fed. Appx. at 389 (Becker, J., dissenting).  However, even under this view of the doctrine, USC's fraud claim would fail because, despite its allegation that WPC "never intended to award the subcontract to USC," Compl. ¶ 59, USC has failed to put forth any evidence of a "subjective and undisclosed intent not to perform."  In fact, Mr. Ulliman testified that he did *not* believe that, at the time the parties signed the BEA, WPC never intended to enter into a subcontract.  Def.'s Facts ¶ 12. In the face of this testimony, USC cannot possibly show that WPC's promise of exclusivity was "made falsely, with knowledge of its falsity or recklessness as to whether it is true or false" at the time the BEA was signed.  *See Gibbs*, 647 A.2d at 889.

-27-

Pennsylvania, plaintiffs are "barred from eliciting parol evidence that they were fraudulently induced into entering . . . contracts").  At best, the oral promise recalled by Mr. Ulliman[12] was a promise to do something in the future — that is, to agree to subcontract terms different from the Principal Contract and WPC's Standard Terms.  This argument, too, is foreclosed, for under Pennsylvania law, it is also "well established that the breach of a promise to do something in the future is not actionable in fraud."  *Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1006 (Pa. Super. Ct. 1997) (citations omitted).  The breach of such a promise may be actionable in contract but not in fraud

Finally, if the gist of the action doctrine and the parol evidence rule did not bar this claim, the Court would find that the undisputed record facts defeat any possible inference of fraud. USC and WPC, both sophisticated parties, jointly negotiated the terms of the BEA.  *See* Pl.'s Mot. Exh. 3 (preliminary BEA draft).  In signing that agreement, Mr. Ulliman bound USC to the payment terms of the Principal Contract and WPC's Standard Terms, with full knowledge of what those particular terms were.  Def.'s Facts ¶ 15 & Exh. A (BEA) ¶ 2.  In view of Mr. Ulliman's testimony that not even he believes that, at the time the parties signed the BEA, WPC never intended to enter

---

[12] This alleged oral agreement is difficult to understand.  Mr. Ulliman states that he was talking with Mr. Markovich of WPC on the telephone at an unidentified time before the BEA and they agreed that WPC would only pay USC when WPC was paid by DCWASA and that, when WPC paid USC, it would be on the basis of 90/10.  Def.'s Facts Exh. B (Ulliman Depo.) at 74 ("Q. So he — the way you and Mr. Markovich worked this out is you agreed that, yeah, you don't have to pay us until WASA pays you but when you do pay us, it has to be for ninety percent? A. Correct.").

The internal inconsistency of this alleged agreement does not seem to be apparent to Mr. Ulliman: If DCWASA paid WPC on the basis of the Principal Contract, it would pay 50/50 of the value of work towards each milestone.  If being paid on a 50/50 basis, WPC could not pay USC from monies paid by DCWASA *and* at 90/10 at the same time.  What each party said to the other is not further recalled with any precision and there is no explanation for the internal inconsistency.  If WPC hung up the telephone believing that USC had agreed to be paid only when WPC was paid by DCWASA, as recounted by Mr Ulliman, it would not be surprising if WPC also believed that USC had agreed to 50/50 payment terms.

into a subcontract, Def.'s Facts ¶ 12, the Court concludes that USC cannot possibly show that WPC's promise of exclusivity was "made falsely, with knowledge of its falsity or recklessness as to whether it is true or false" at the time the BEA was signed.  *See Gibbs*, 647 A.2d at 889.  USC faces a high bar, indeed, in advancing a fraud claim based on a document that contradicts the alleged misrepresentation.  Because WPC's alleged misrepresentation was, for reasons already discussed at length, indisputably at odds with the provisions of the BEA, the Court also finds that USC's reliance on WPC's alleged misrepresentation was not justified.  *See id.*

> The written record reveals disagreement on payment terms but no fraud.  USC knew as early as May 2001 that WPC intended to pay its subcontractors according to the terms of the Principal Contract.  Def.'s Reply Mem. in support of its Mot. to Dismiss, Exh. A (WPC Standard Terms) ¶ 8.18.2.  USC knew in June 2001, when it signed the BEA, that WPC intended to pay its subcontractors according to the terms of the Principal Contract.  Def.'s Facts Exh. A (BEA) ¶ 2. USC knew in March 2002 that WPC intended to pay its subcontractors according to the terms of the Principal Contract.  Compl. Exh. D ¶ 23.  It can have come as no shock when, in June and July 2002, WPC insisted that it would pay USC according to the terms of the Principal Contract.  Under these circumstances, a commercial agreement entered into with eyes wide open cannot form the basis for a fraud claim.  Summary judgment will be entered for WPC on Count II.

## C.  Count III: Promissory Estoppel

> Count III alleges that "USC justifiably and reasonably relied upon WPC's promise to issue the Subcontract to USC if USC provided quotations to only WPC."  Compl. ¶ 67.  It seeks recovery on the basis of promissory estoppel.

Under Pennsylvania law, to make out a claim for promissory estoppel, "the aggrieved party must show that (1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000).  The doctrine has been variously described by Pennsylvania courts as "a substitute for consideration, an exception to the ordinary contract requirements, or even as a species of consideration." *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) (quoting *Cardamone v. Univ. of Pittsburgh*, 384 A.2d 1228, 1233 n.9 (Pa. Super. Ct. 1978)) (internal quotation marks omitted).  It is "[g]enerally . . . invoked in situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise."  *Id.*  Accordingly, it is "an equitable remedy to be implemented only when there is no contract; it is not designed to protect parties who do not adequately memorialize their contracts in writing."  *Massaro Ltd. P'ship v. Baker & Taylor Inc.*, Nos. 04-1462, 04-1523, 2005 U.S. App. LEXIS 27993, at *9 (3d Cir. 2005) (unpublished) (quoting *Iversen Baking Co. v. Weston Foods, Ltd.*, 874 F. Supp. 96, 102 (E.D. Pa. 1995)).

Count III fails for multiple reasons.  As an initial observation, it is based on a severely abbreviated version of WPC's promise, which of course was qualified by a number of other contractual provisions, including USC's promise to perform based on the requirements of the Principal Contract and WPC's Standard Terms — terms with which USC itself never had any intention to agree.  Def.'s Facts Exh. A (BEA) ¶ 2.  USC essentially asks the Court to read Paragraph 1 of the BEA in a vacuum, ignoring the balance of the contract.  This the Court cannot do.

In any event, Pennsylvania law does not recognize an action in promissory estoppel where, as here, there is an enforceable contract. *Carlson*, 918 F.2d at 416 ("In light of our finding that the parties formed an enforceable contract, relief under a promissory estoppel claim is unwarranted."); *Massaro*, 2005 U.S. App. LEXIS 27993, at *9 (stating that promissory estoppel is "to be implemented only when there is no contract"); *Synesiou v. Designtomarket, Inc.*, No. 01-5358, 2002 WL 501494 at *4 (E.D. Pa. 2002) (noting that "promissory estoppel has no application when parties have entered into an enforceable agreement"). USC has consistently asserted that the BEA is a valid and enforceable contract dictating the parties' rights and obligations. *See, e.g.*, Pl.'s Mot. at 18. WPC surely agrees. Def.'s Opp'n to Pl.'s Mot. at 11. And the Court has so found. Because promissory estoppel will not lie in the face of a valid contract, Count III must be dismissed.

USC seeks to avoid this result by arguing that the BEA would be an illusory contract if WPC's interpretation were accepted, because the promise to subcontract work to USC would be dependent on the "whim" of WPC. Relying on a colorful quote from the North Dakota Supreme Court in *Harrington v. Harrington*, 365 N.W.2d 553, 555 (N.D. 1985), USC argues that "[a]n illusory contract may be defined as an expression cloaked in promissory terms, but which, upon closer examination, reveals that the promisor has not committed himself in any manner. In other words, an illusory [contract] is a [contract] that is not a [contract]. The [contract] is an illusion." This argument, besides flatly contradicting USC's previous insistence that the terms of the BEA are "sufficiently definite to enforce," Pl.'s Mot. at 18, misperceives the contingencies inherent in the parties' contractual relationship.

Under the BEA, WPC clearly promised to subcontract the PCCS Project to USC subject to important contingencies, the absence of which would release both parties from their

promises.  One contingency was that DCWASA award the PCCS Project to WPC; without that award, the deal was off.  Another contingency was that the parties would successfully negotiate the equipment and services to be provided under any subcontract as Subcontractor Workscope; without agreement on Subcontractor Workscope, the deal was off.  Def.'s Facts Exh. A (BEA) ¶ 1.  Further, however, USC agreed in Paragraph 2 of the BEA to perform the Subcontractor Workscope based on the requirements of (1) the Principal Contract, (2) WPC's Standard Terms, and (3) modifications to these "as negotiated and mutually agreed upon," *id.* ¶ 2; without such an agreement, the deal was off.  These terms did not allow WPC to reject a subcontract with UPC on a "whim."  To the contrary, there was adequate consideration to support WPC's promise.  WPC could only fail to award the subcontract to USC if one of the contingencies were not met.  The argument that the BEA constituted an illusory agreement is without merit.

This conclusion is reinforced by *ATACS Corp. v. Trans World Comms.*, 155 F.3d 659 (3d Cir. 1998), in which the Third Circuit considered the enforceability of "teaming agreements," which it described as "arrangement[s] whereby a subcontractor will 'team' with a company intending to bid on a government contract as a prime contractor in order to pool financial and technical resources."  *Id.* at 666.[13]  As pertinent here, the *ATACS* court recognized:

> In many cases, the finalized subcontract between the parties to a teaming agreement will specifically enumerate the scope of obligations for each party contingent upon the prime contractor winning the [project] so that there is usually little need to enforce the

---

[13] USC consistently refers to the BEA as a "Teaming Agreement," a characterization flatly rejected by WPC.  The Ninth Circuit has explained that "teaming agreement" is "not a term narrowly fixed in its meaning but varying with different contexts and arrangements."  *Cable & Computer Tech., Inc. v. Lockheed Sanders, Inc.*, 214 F.3d 1030, 1035 (9th Cir. 2000).  Although the Court observes that the BEA shares some characteristics with teaming agreements, it sees no need to muddy the waters, and uses the term "BEA" because that is the heading on the document itself.

> teaming arrangement itself. Often, however, the parties may reach an
> understanding to team, but fail to execute a subcontract as anticipated
> in the teaming agreement.

*Id.*  The court continued: "The fact that the parties never finalized an implementing subcontract is usually not fatal to enforcing the teaming agreement on its own — if the parties intended the teaming agreement itself to constitute a binding agreement that enumerated definite terms of behavior governing the parties during, or even after, the bidding process."  *Id.* at 667.  It concluded that "Pennsylvania law would recognize a teaming agreement as an enforceable contract provided that the parties intended to be bound by the teaming arrangement and the agreement contains sufficient terms for enforcement."  *Id.*  The written promises made by WPC were fully performed.  WPC promised to subcontract with USC *if* the DCWASA awarded the PCCS Project to WPC, *if* the parties agreed on Subcontractor Workscope, and *if* USC agreed to perform based on the terms, including payment terms, of the Principal Contract.[14]  USC never intended to accept the 50/50 payment terms of the Principal Contract, although it bound itself to do so in the BEA.  While the Court understands that Mr. Ulliman believed he was protected by a prior oral agreement that WPC would pay USC on 90/10 terms, that innocent belief cannot overcome the language of the BEA that he signed, nor impose liability on WPC for alleged promissory estoppel.  The fault, if any, lies with Mr. Ulliman.  The Court will grant summary judgment on Count III to WPC.

---

[14] The Court reads Count III as based solely on WPC's promise — memorialized in the BEA — to subcontract exclusively with USC under the conditions the Court has detailed.  Compl. ¶¶ 63-65, 69.  Count III alleges no subsequent promises, representations, or behavior on the part of WPC.  Thus, the Court understands the terms and conditions of the BEA to encompass the entirety of WPC's promise to USC on which Count III is based.

### D.  Count IV: Failure to Negotiate

Count IV alleges that WPC "had an affirmative obligation to negotiate in good faith" and that the subcontract it offered to USC in July 2002 was "contrary to what had been agreed upon previously by the parties."  Compl. ¶ 73.  It specifically alleges that this "bad faith" is reflected by WPC's issuance of an "ultimatum in its letter of July 16, 2002," and refusal to negotiate further.  *Id.* ¶ 74.  These allegations fare no better when advanced on a theory of bad faith than they did under other theories of liability.

The Pennsylvania Supreme Court has not determined whether a cause of action for breach of duty to negotiate in good faith exists in that state.  *GMH Assocs. Inc. v. Prudential Realty Group*, 752 A.2d 889, 903 (Pa. Super. Ct. 2000).  However, the Third Circuit in *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986), predicted that Pennsylvania would recognize such an action.  *Id.*; *see also Dep't of Gen. Servs. v. On-Point Tech. Sys.*, 870 A.2d 873, 873 (Pa. 2005) (Saylor, J., joined by Nigro and Baer, JJ., concurring in part and dissenting in part) ("I would also specifically confirm the Third Circuit's prediction that this Court would cognize a contract-based cause of action for breach of an agreement to negotiate in good faith.").  As stated by the Third Circuit:

> An agreement to negotiate in good faith is a contract.  Therefore, the plaintiff states a cause of action for breach of this duty when he alleges facts which, if proven, demonstrate that (1) both parties manifested an intention to be bound by an agreement to negotiate in good faith; (2) the terms of the agreement were sufficiently definite to be enforced; (3) consideration was conferred, and (4) the agreement was breached by bad faith conduct.

*Flight Sys. Inc. v. Elec. Data Sys. Corp.*, 112 F.3d 124, 130 (3d Cir. 1997).  The Pennsylvania Superior Court has followed the Third Circuit's approach in a number of cases, though it generally

has assumed without deciding that the cause of action would be accepted by its high court.  *See, e.g.,* *GMH Assocs.*, 752 A.2d at 904 (holding that even if Pennsylvania recognized the cause of action, it was not proved on the facts presented).

In *Channel*, the Third Circuit evaluated whether a letter of intent concerning the lease of retail space in a shopping mall was enforceable as a mutually binding obligation to negotiate in good faith over lease terms, where the parties ultimately did not reach agreement on a definitive lease.  *Channel*, 795 F.2d at 299.  In determining whether both parties had manifested an intent to be bound, the court examined "the entire document and the relevant circumstances surrounding its adoption."  *Id.*  It first noted that the letter of intent provided that "to induce [the tenant] to proceed with the leasing of the Store, [the landlord] will withdraw the Store from the rental market, and only negotiate the . . . leasing transaction to completion."  *Id.*  This it described as an "unequivocal promise . . . to negotiate the leasing transaction to completion."  *Id.*  The court looked to the parties' course of conduct after signing the letter of intent — such as their efforts to satisfy lease contingencies, prepare lease drafts, and renovate the premises — and found that these "surrounding circumstances" were further evidence of the parties' intent to be bound.  *Id.* at 299-300.  After confirming that consideration was present, the court concluded that there was sufficient evidence from which a jury could find that the parties intended to be bound by a promise to negotiate in good faith.  *Id.* at 300 & n.9.

In *Flight Systems*, the Third Circuit faced a similar scenario involving the enforceability of a prospective tenant's letter outlining desired terms of a lease of office space, where the tenant backed out before the lease was consummated.  *Flight Systems*, 112 F.3d at 130.  In its complaint, the landlord alleged that the tenant "manifested its intention to be bound by establishing

-35-

terms for a lease in [that] letter and engaging in intensive negotiations in the following two months."
*Id.*  The complaint further asserted that the landlord had provided consideration in the form of its
removal of the premises from the market during negotiations, and that the tenant acted in bad faith
by concealing the fact that it had no intention of executing the lease without first securing additional
business in the area.  *Id.* at 130-31.  The court agreed that the landlord's allegations were sufficient
to state a claim, and reversed the district court's Rule 12(b)(6) dismissal.  *Id.* at 131.  It specifically
rejected the tenant's argument that a caveat contained in the letter — "[t]his is strictly an outline and
is contingent upon [the tenant's] internal approval and a mutually executed lease document" —
negated the inference that both parties' had manifested assent to be bound.  *Id.* at 131 & n.4.  The
court noted, rather, that this provision "merely raises an issue of material fact; it does not preclude
the claim since [the landlord] relies not only on this letter but on [the tenant's] course of conduct to
argue that [the tenant] agreed to negotiate in good faith."  *Id.* at 131.

It is noteworthy that both *Channel* and *Flight Systems* look not only to the letter of
intent itself, but also to the parties' course of conduct, in weighing the parties' intention to be bound
by an agreement to negotiate in good faith.  *Channel*, 795 F.2d at 299-300; *Flight Systems*, 112 F.3d
at 131.  This approach finds some support in Pennsylvania cases dealing with the proper construction
of contracts generally.  *See, e.g.*, *United Refining Co. v. Jenkins*, 189 A.2d 574, 580 (Pa. 1963)
(reviewing principles applicable to the "construction of any contract") (cited in *Channel*, 795 F.2d
at 299 n.8); *Fenestra Inc. v. John McShain Inc.*, 248 A.2d 835, 836 (1969) (interpreting an oral
agreement and considering it "well settled that the actions of the parties pursuant to the contract are
significant and substantial evidence of their intentions") (cited in *Flight Systems*, 112 F.3d at 131).
However, in more recent cases specifically addressing whether the parties' agreement embraces an

-36-

obligation to negotiate in good faith, the Superior Court has focused its inquiry more narrowly, and has expressed approval of the principle that "[t]he full extent of a party's duty to negotiate in good faith can only be determined, however, by the terms of the letter of intent itself." *GMH Assocs Inc. v. Prudential Realty Group*, 752 A.2d 889, 903 (Pa. Super. Ct. 2000); *see also Jenkins v. County of Schuylkill*, 658 A.2d 380, 385 (Pa. Super. Ct. 1995). That principle, in turn, finds its immediate roots in the Seventh Circuit's decision in *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group Inc.*, 873 F.2d 155 (7th Cir. 1989), in which the court reviewed its case law on the subject and concluded that "the scope of any obligation to negotiate in good faith can only be determined from the framework the parties have established for themselves in their letter of intent." *Id.* at 159; *see also id.* at 159 n.2 ("We refuse to read into the letter of intent language that does not exist.").

Applying these principles to the instant facts, the Court concludes that, in evaluating the parties' intent to be bound by an agreement to negotiate in good faith, it should focus, as have the Pennsylvania courts, on the terms of the BEA itself. *See GMH Assocs Inc.*, 752 A.2d at 903; *Jenkins*, 658 A.2d at 385; *see also A/S Apothekernes* 873 F.2d at 159. Although USC asserts that "WPC had the affirmative obligation to negotiate in good faith . . . pursuant to the [BEA]," Compl. ¶ 72, the Court is unable to locate such an explicit agreement in the BEA. Thus, for USC to prevail on this claim, the Court would have to find an implied obligation to negotiate in good faith.

It is undisputed that, at the time the parties signed the BEA, they contemplated further negotiations to finalize the workscope and other subcontract details. Def.'s Facts ¶ 6 & Exh. B (Ulliman Depo.) at 122-23. However, even if a duty to negotiate in good faith can be implied on these facts, its "scope . . . can only be determined from the framework the parties have established

-37-

for themselves" in the BEA.  *See A/S Apothekernes* 873 F.2d at 159.  In the BEA, WPC secured

USC's promise to perform the Subcontractor Workscope based on the requirements of (1) the

Principal Contract, (2) WPC's Standard Terms, and (3) modifications to these "as negotiated and

mutually agreed upon."  Def.'s Facts Exh. A (BEA) ¶ 2.  USC expressly acknowledged its

"familiar[ity] with the requirements of the Principal Contract and agree[d] to be bound" by them.

*Id.*  Those provisions provided for 50/50 payment terms unless otherwise agreed.  WPC certainly had

no obligation to negotiate itself out of BEA terms that USC had already accepted.  Its insistence on

payment terms consistent with the BEA — after thirteen months of subcontract negotiation — can

hardly be considered bad faith.  And the BEA itself, with its explicit recognition in Paragraph 6 that

a definitive subcontract was not an inevitability, is a far cry from the "unequivocal promise" in

*Channel* to "negotiate the proposed transaction to completion."  *See Channel*, 795 F.2d at 299; see

also Def.'s Facts ¶ 10 & Exh. B (Ulliman Depo.) at 287 (recognizing this risk).

      Under these circumstances, the Court concludes that, if Pennsylvania recognizes a

cause of action for breach of an obligation to negotiate in good faith, that duty was not breached on

the facts of this case.  USC cites no Pennsylvania law in support of its argument to the contrary.

Pl.'s Opp'n at 14-15.  The Court will grant summary judgment to WPC on Count IV.

### E. Count V: Attorneys' Fees

      USC lastly claims attorneys' fees based on allegations that WPC "acted in bad faith,

has been stubbornly litigious, and has caused USC unnecessary trouble and expense."  Compl. ¶ 77.

WPC argues that Pennsylvania follows the "general, American rule that there can be no recovery of

attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement

by the parties or some other established exception."  Def.'s Mot. at 23 (quoting *Merlino v. Delaware*

*County*, 728 A.2d 949, 951 (Pa. 1999)).  USC responds that District of Columbia law recognizes an exception to the American rule where "a party . . . withholds action to which the opposing party is patently entitled . . . and does so in bad faith, vexatiously, wantonly, or for oppressive reasons."  Pl.'s Opp'n at 15 (quoting *1901 Wyoming Ave. Co-op Ass'n v. Lee*, 345 A.2d 456 (D.C. 1975)).

No attorneys' fees are available here.  First, Pennsylvania, not District of Columbia, law applies, and USC has identified no statutory exception to the American rule in that jurisdiction. Second, USC's argument ignores the clear terms of the BEA, which provides that "neither party shall be responsible to the other for costs associated with proposal preparation or contract negotiation." Def.'s Facts Exh. A (BEA) ¶ 7.  In addition, the parties understood that Paragraph 6 of the BEA provided that, in the event subcontract negotiations were unsuccessful, both parties "could walk away from each other" without obligation or responsibility.  *Id.* Exh. B (Ulliman Depo.) at 287; *see also id.* Exh. B at 133-34.  This contractual language negates any suggestion that the parties may have intended to have a fee-shifting arrangement if they failed to reach agreement on a subcontract. Finally, even if D.C. law were to apply, the "bad faith" exception USC invokes is a limited one.  It is "intended to punish those who abuse the judicial process" and is applicable "only in the presence of extraordinary circumstances or when dominating reasons of fairness so demand."  *Synanon Found. Inc. v. Bernstein*, 517 A.2d 28, 37 (D.C. 1986).  "A party is not to be penalized for maintaining an aggressive litigation posture, nor are good faith assertions of colorable claims or defenses to be discouraged."  *Id.* (quoting *Lipsig v. Nat'l Student Mktg. Corp.*, 663 F.2d 178, 180-81 (1980) (per curiam)).  Here, WPC stood on a reasonable interpretation of a disputed contract clause and prevailed.  In view of the Court's findings on Counts I–IV, there is no basis for attorneys' fees based on bad faith.  USC's claim for attorneys' fees will be dismissed.

## VI. CONCLUSION

Although it advances various theories of liability, USC essentially complains that WPC agreed orally to its 90/10 payment terms and breached that agreement by refusing to issue a subcontract on those terms.  This purported oral agreement preceded and is inconsistent with the BEA that both parties signed.  Under Pennsylvania law, parol evidence cannot be admitted to change the terms of the written BEA.  WPC offered a subcontract on terms that were compliant with the BEA and came directly from the Principal Contract.  USC refused to accept a subcontract on terms different from its alleged oral agreement.  Thus, the parties failed to reach agreement on this modified payment term and, pursuant to Paragraph 6 of the BEA, each was released from its promise of exclusivity.  None of the allegations against WPC having merit, the First Amended Complaint will be dismissed in its entirety.

A memorializing order accompanies this memorandum opinion.


Date: March 31, 2006                                   _____/s/_____
                                                        ROSEMARY M. COLLYER
                                                        United States District Judge